The next case is number 2011-5038, Robert Rickett against the Secretary of Health and Human Services. Mr. Shoenig. Good morning, Your Honor. This case, Your Honor, is about the uncontested testimony of Robert Rickett about events that occurred in his life but that were not documented in the medical records. It is not about medical records that are inconsistent or contrary to his testimony, which the special master found. But isn't the case really about the foundation of the physiological or biological relationships of this vaccine and his disability? Yes, Your Honor. About the medical theory of causation? That's exactly right. And Dr. Belanti described the medical theory in extreme detail beginning at A987 through A997. In addition, Dr. Belanti pointed out an article by Dr. Schoenfeld, Exhibit 38, entitled Fibromyalgia, Infection, and Vaccination, Two More Parts of the Etiologic Puzzle. He went into great detail. If we go back to look at the decision that special master found in the Lee case, which we referenced. In the Lee case, the special master found that the vaccine caused a headache. The headache triggered fibromyalgia. In this case, Dr. Belanti went far beyond that. Dr. Belanti's testimony in the Lee case, there was no testimony about how a vaccine causes a headache or how a headache triggers fibromyalgia. That was accepted in the Lee case. In this case, Dr. Belanti went to extreme detail to talk about the NEI system, which is the Neurological Endocrine Immune System, how those three systems work together. It's a tripartite system. He explained how the vaccine can cause this type of reaction or be a trigger of fibromyalgia through any of these routes. But isn't the problem here that the special master didn't necessarily disagree with this general causation notion. The special master said that the evidence shows that these symptoms existed before the vaccine was given to Mr. Ricketts. As a matter of fact, that's not the case, Your Honor, because even the respondent's expert, Dr. Brenner, testified that the fibromyalgia started in summer of 1998. The summer of 1998 is after the first two vaccinations. The first vaccination was given in March. The second one in April. And if I could, I'd like to talk about the details of that, because they are important. And it's important to see why the special master rejected this evidence. I think it'll be very clear when I explain this. Prior to his vaccinations, Robert had a complicated medical history, this detail beginning on page 8 of our brief. His last visit to the doctor before his vaccinations was on February 16, 1998. And that's where he talks about how he had some back problems after shoveling snow. The respondent's expert at that visit is at A208. The respondent's expert, Dr. Brenner, testified at A103 that this visit cannot be construed as the onset of his fibromyalgia. So here's the visit right before his vaccinations. The respondent's expert, A1083, says that he does not think that's the onset of his fibromyalgia. March 10, 1998, he has his first hepatitis B vaccine. There is no medical record between the date of that vaccine and April 8, 1998, when he gets his second vaccination. The affidavit of Robert Rickett and his testimony is clear that after that vaccination, he experienced diarrhea. He experienced shoulder and scapular muscle pains. But those resolved. That evidence is also confirmed. The government's point, though, is that, yes, that's what he testified to. But his medical records don't support that. And in this case, what the special master ultimately said is the medical records are a better indicator of what actually occurred so much earlier than is his current recollection. Isn't that right? That's exactly right. Exactly right. And Dr. Belanti conceded in his testimony. He stated that, look, there are no medical records. There was no medical evaluation done of that diarrhea. No doctor questioned him about it. There was no medical workup. So all I can do is speculate that that might have been irritable bowel syndrome, which is often seen with fibromyalgia. Dr. Belanti said, I can't do any more than speculate on that. He admitted that. He agreed with that. The second vaccination is given on April 8, 1998. And according to Mr. Rickett, within 24 hours, he developed pain in the right arm that spread to his neck and then into the left arm. Mr. Rickett was adamant that this did not start until after that second vaccination. So let's look at the medical record. And this is the important one. In an office visit on April 24, 1998, which is A-206, says he complains of right arm and shoulder pain times two to three weeks, left arm and shoulder beginning yesterday. The special master said, OK, if it was two weeks before, that would be after the second vaccination. If it was three weeks before, it would be before the second vaccination. So the special master ignored the testimony of the petitioner, says you can't accept his testimony that occurred after the vaccination, even though this is totally consistent with it. But given our standard of review, if really what the special master did was to say, look, we've got his testimony and we have medical records that aren't consistent with his testimony, and I choose to give more credibility to the actual medical records where there is a discrepancy, how can we, as a court of review, say that that's arbitrary and capricious? Because the record here, two to three weeks, is consistent with his testimony. Two weeks before is after the second vaccination. So there's nothing inconsistent about that. If you're in pain for two weeks, believe me, it feels like three weeks. It may even feel like four or five weeks. So when you go to a doctor and he says, how long has this been going on? For the last two or three weeks. How many of us are specific? There's no specific date, but he is adamant in his testimony. And we have the affidavits and the record from other people, including a close friend, that confirm that this did not happen until after the vaccination. Wasn't the inconsistency regarding the diarrhea really spread over a year? No, the diarrhea, I don't think that is the inconsistency. The inconsistency has to do with the timing of it. No, even the respondent's expert agrees that the diarrhea, by the summer, the diarrhea is constant and that the pain is ongoing from that point on. Going back to what we said earlier, even if you accepted three weeks before the vaccination so that make it before the second vaccine, it still was less than a month after the first vaccine. And if you go to Dr. Brenner's testimony, on page A1084, Dr. Brenner says that we know that there can be several months between the inciting event and the onset of symptoms. So even Dr. Brenner is saying there can be several months between the onset of symptoms and the triggering event. So even if you accept that it occurred three weeks before and not two weeks before, it still is less than a month after the first vaccination and well within the time frame that Dr. Brenner himself sets for inciting and triggering event. So there's no dispute there. Now you go on to the third vaccination, September 22, 1998. According to the petitioner, within hours after receiving this vaccine, his body started hurting worse. He developed extreme headaches, overwhelming anxiety and fatigue. His pain and diarrhea became worse. The medical records are totally consistent with this. On September 24, he saw Dr. Moses. That's at A894. And Dr. Moses describes somatic complaints. What are somatic complaints? On page 11 of the Lee case, Dr. Brenner believes that fibromyalgia is a functional somatic syndrome. So what Dr. Moses was describing two days after the third vaccination is somatic complaints were exactly what you see with fibromyalgia. Then there's a subsequent visit, October 28, 1998, which is A173. And there, the doctor says, complains of one-month history of burning neck pain with some extension into his intrascapular region as well as his proximal sole shoulders. Go back one month from October 28. That's September 28. September 28 is four days after the September 24 vaccination. These records are totally consistent. The only thing that the special master picked up on was this two to three weeks. And the two to three, to say two to three weeks puts it either after the second one or before the second one, but it's still after the first one, should have no effect on this case. As a matter of fact, if you go to Dr. Brenner's testimony A1092, he talks about another way that a vaccine can cause fibromyalgia. He talks about the court asking the question, if hepatitis B vaccine caused a serum sickness-like condition, could fibromyalgia follow a serum sickness-like condition? He says, oh, that's a whole other question. The answer is that if you say to me that it caused a definable injury illness, could that illness have then led to this and the answer has got to be yes. I can't say no. So now what do we do with that? We go back to A538. On A538, we have Dr. Kennedy's evaluation, where Dr. Kennedy, in looking at all that's happened, says, while it is conceivable that he could be a rare serum sickness-like reactor to hepatitis B vaccination, the duration and magnitude of his symptoms seem well out of proportion. He's saying that the reaction seems out of proportion. What he doesn't understand is what Dr. Brenner said, is if you have a serum sickness-like reaction, that can trigger the long chronic condition, which is fibromyalgia. So even Dr. Brenner's testimony, put with this, gives us a theory of causation. But that wasn't Dr. Belanti's testimony. Dr. Belanti's testimony was a theory of causation was challenge, re-challenge. And the special master found that he didn't adequately identify the challenge, the first symptoms. Dr. Belanti's testimony, his theory was that vaccines can trigger fibromyalgia. Everybody agrees. They're expert. Everybody agrees that there are certain triggers, things that can trigger fibromyalgia in a genetically susceptible individual. From the Lee case, we already know that the vaccine is one of those triggers. It's a potential trigger. Other triggers, Dr. Belanti went through and explained. Allergic reactions can trigger it. Infections can trigger it. Vaccines can trigger it. All these things can trigger it. When I went through and talked with Dr. Brenner and I asked him all these questions, is there any evidence of an infection? No. Was there any evidence of an allergic reaction? No. Well, there was evidence of an allergic reaction. In fact, a serum sickness-like reaction is kind of like an allergic reaction. Dr. Brenner kept trying to paint Dr. Belanti into the corner of saying this is an autoimmune disease. Dr. Belanti never said it was an autoimmune disease. As a matter of fact, he said it the contrary. There are all kinds of immune-mediated reactions. An allergic reaction is an immune-mediated reaction. There are other reactions that take longer, like an autoimmune-type reaction. Dr. Belanti never claimed this was autoimmune. He was explaining how the vaccine affects the neurological system, the headache. For instance, in Lee case, the vaccine can cause a headache. That's the neurological system, which can trigger fibromyalgia. It can affect the immune system, like an allergy or a serum sickness-like reaction. It can affect the hormonal system, the endocrine system. Any one of those three effects can trigger fibromyalgia in a genetically susceptible individual. And the special master found there wasn't enough evidence of those effects on this record. That's just a theory. That's the theory of how it can trigger it. It's clear, even if you accept Dr. Brenner's testimony, that the fibromyalgia started in the summer of 1998. Let's accept that. He said it started in the summer of 1998. He also testified that it can take several months for the inciting event to trigger fibromyalgia. That's his testimony. We know that within several months before the summer of 1998, he had two hepatitis B vaccines. So the timing, even according to Dr. Brenner, is appropriate. What Dr. Belanti was saying, he didn't rest his theory on this. He just said that I have a theory of causation. There's a logical sequence of cause and effect. There's the appropriate temporal relationship. And he said, also, it looks to me like this was a case of positive re-challenge, because he reacted after that first or second vaccine, whichever way you want to cut it. And then he had a more severe reaction after the third one, which is documented in medical records. So clearly, he was made worse. Dr. Belanti testified that there's things that can make fibromyalgia worse. For instance, he said in the- Did he ever define the time limits in which reactions and symptoms should have occurred as a result of the vaccine? Yes, he said that the timeliness here, as he thought it was- Time limits. Time limits, how far out? He didn't say how far. He testified that the few days that we're talking about was appropriate. Dr. Brenner gives us the outside limits, because Dr. Brenner testifies it can take several months. So we go from, there's clear in the record that the timing can be anywhere from a few days or hours to months. That's the timing, using our expert, using their expert. Dr. Belanti didn't discuss whether it could take several months, because that wasn't his view of the evidence. But the evidence is there that supports that. And I reserve the rest of my time. OK, thank you, Mr. Shumachin. Ms. Perlin. Ms. Perlin, we're seeing a lot of cases involving the hepatitis B vaccine. Is the secretary, is the department looking at the possibility of putting something on the table related to it? Well, the IOM actually last week, yeah, I believe it was last week, investigated a lot of different vaccines to see if there was a causal relationship between lots of different conditions in the vaccine. That report came out. That is something that the Secretary of Health and Human Services will look to in determining whether or not there is sufficient evidence to establish a table injury and a causal relationship between a vaccine and a particular condition. The condition we are talking about here, though, fibromyalgia. Did they make any findings as to hepatitis in that report? Honestly, I haven't had a chance to go through it with a fine tooth comb. I believe they addressed all of the childhood vaccines. Is that the one that was done in conjunction with the National Academy of Sciences? Yes, I believe so. Wasn't that really just focused on autism and diabetes? I don't believe so. I know there was an investigation into Guillain-Barre syndrome and all sorts of other conditions. I do know that it's several inches thick because I have seen it. But I have not had an opportunity to read through it. Just want to clear up one factual inaccuracy that Mr. Shoemaker made. Vaccine is not a known trigger of fibromyalgia. There was never any evidence presented that a vaccine is a trigger for fibromyalgia. Mr. Shoemaker keeps saying genetically predisposed. And we have come to understand on this court that the foundation for this entire compensation structure is the inequality on the part of the patient based on genetic predisposition. Well, it might be true that there is a genetic predisposition, that there has to be a trigger of some sort to create this condition, if we are going to assume that the person is susceptible. In this case, there is no evidence, no factual evidence, that the vaccine acted as any sort of trigger. The sole issue before this court is whether or not the special master's factual findings were arbitrary and capricious. If they weren't, the remainder of appellate's objections lack any basis because the factual predicates for their theory simply don't exist. Isn't there evidence on the record, though, that after he received the vaccines, that he had immediate challenges and reactions to the vaccines? The medical records do not establish that at all. There's no evidence on the record that he had medical reactions that occurred around the time that he received the vaccines? There is no evidence in the medical record. That evidence came from the testimony of Mr. Rickett. The first vaccine, there is nothing. He did not go to any doctors for a month. He did not complain to anyone when he returned for his second vaccine. There's no evidence he had a problem. He claims he developed diarrhea within 24 hours. Not only is there- But he didn't associate it, in his mind, with a vaccine. It was only after the third, that response, the next day, after the third vaccination, that perhaps it occurred to him that there was some relationship. OK, we can talk about both. The first vaccine, the diarrhea, when it first came up, which was almost one year later, in March of 1999, Mr. Rickett said, I have had diarrhea since the previous summer. March is not summer. And March is when he says that he developed diarrhea. So I don't see how there's any factual basis in the record for his recollection today that he developed diarrhea within 24 hours. Regarding the third vaccination, he went to his doctor to get a tuberculin test. Would it be different to you if he would have said spring? Probably not. If it was as bad as Mr. Rickett made it out to be, I would think it would be somewhere in the records, because he went to see doctors for common colds and aches and pains in the months before that. It wouldn't be consistent with how he acted if he had this serious problem and didn't complain to his doctor about it. But regarding the third vaccination, he went to his doctor for a tuberculin test in relation to his occupational therapy internship that he was undergoing. He went two days after receiving the vaccine, which is when he said he was manifesting all of these symptoms. There is nothing in Dr. Moses's records to reflect that. It reflects that he has generalized anxiety. He was prescribed Xanax. He had, there's simply nothing to document the complaints that he says he had. When he went to see Dr. Kiefer, who was his surgeon, in late October, he did give a history that he had had shoulder pain for, I believe, two months, which would precede the third vaccine, and burning neck pain of one month, which, as Mr. Shoemaker said, would be September 28. However, I urge you to look at Dr. Moses's records. He actually saw Dr. Moses in August, a month prior to the vaccine, for that exact complaint, burning neck pain. So there is no factual basis that there was any type of reaction to any of the three vaccines. The medical records simply are devoid of that. Your brief relies heavily on an argument on the sufficiency of medical testimony, or testimony, as opposed to medical records. Are you arguing that one is better than the other? Isn't just testimony enough in order to prove causation? Well, I believe this court has been very clear in the Koukouris case that when there is a conflict between medical records, particularly contemporaneous medical records, and live testimony, significant weight should be given to the medical records. What about in the Athens case, in the three-pronged test, and one of the prongs being testimony? Well, that's it. By minimizing the testimony, did the special master say that medical evidence, or rather the record, always trumps over testimony? He did not use any extremes. He did not say always. And I know from firsthand experience, sometimes testimony does trump the contemporaneous medical records. That was not the case here. The special master evaluated the evidence as a whole. He saw Mr. Rickett testify. He looked through all of the records, and he made a determination that he was going to credit the contemporaneous medical records over his testimony. That determination is entitled to significant deference by this court, and any reviewing court. As this court actually said in the Lombardi case, which a reviewing court is not at liberty to second-guess the special master's fact conclusions. And that is what is being challenged here, the special master's factual conclusions. On appeal, Judge Miller at the Court of Federal Claims reviewed these findings, and he could not discern any error. To the contrary, he concluded that the special master's findings and analysis were not only rational and supported by substantial evidence in the record, but they were eminently reasonable. If the court has no further questions. Any questions? No. Any questions? Thank you. Thank you. We just asked that the court inform the special master in this case. Thank you. Thank you, Ms. Brown. You should make it. Thank you. We don't need the IOM to tell us that fibromyalgia can be triggered by hepatitis B vaccine. The Lee case already does that. In the Lee case, the same special master found that the vaccine caused a headache, which triggered the fibromyalgia. So we know that there are mechanisms by which pain. Should the special master apply some sort of principle of stare decisis? I'm not asking for stare. I'm asking for fairness. This is a program that begs for fairness. This is a program that's supposed to be petitioner friendly, informal, non-adversarial, generous, and speedy. And it's none of those things. This is a program where a petitioner should not be treated like this. The special master said that his testimony was credible. That's what the special master said. And then he tried to make Dr. Bellanti write a report using only the medical records. I've represented these cases for over 30 years. You can't do that. If you look at your medical records, or if I look at my medical records, it does not tell the story of our lives and what happened to us. No one knows better what happened to them than the person that lived through it. You can also look, however, at exhibit 16 in this case, which is the description of the symptoms and a confirmation by a friend of this, Robert, who testified exactly to the same thing he did. The first vaccination, nothing was reported in the medical records. He had some diarrhea, some pain, but it resolved. He had no insurance. He didn't go to the doctor, so it's not there. Doesn't mean it didn't happen. And Dr. Bellanti says, OK, I can't rely on that, because it really is speculation. The second vaccination, there clearly is evidence of a reaction. And I already pointed out that if you look at the 4-24-98 record on A-206, it says complaints of right arm and shoulder pain for two to three weeks. Left arm and shoulder began yesterday. Clearly, those are symptoms that he's describing to a doctor that occurred after the second vaccination. So you're absolutely right. The timing is in the medical records. It confirms what he says happened. That went on, and that pain did not stop. It continued throughout the summer. As a matter of fact, Dr. Brenner believes that throughout that summer, sometime during that summer, he doesn't say when. He says in the summer of 98 on, that's when he think that he had fibromyalgia because the symptoms were constant thereafter. And if you look at Dr. Moses' record, A-894, on 6-12-98, he's complaining of pain. 8-22-98, he's complaining of pain. The visit on 9-24-98 is two days after the vaccination. And two days after the vaccination, he has somatic complaints. But then if you look at the October 28, 1998 visit, A-173, he complains of a one-month history of burning neck with some extension into his intrascapular region as well as his proximal shoulders. So clearly, this fits perfectly with what he said happened after the third vaccination. He said after that, he was able to plug on, go through his internship over that summer. After that third vaccination, the bottom fell out. The pain became terrible. And it was finally when he was referred to this Dr. Goldfarb, who is a rheumatologist. He's finally the one who says, OK, you've got fibromyalgia. Nobody else picked that up before then. None of these other doctors knew that it was fibromyalgia. They weren't rheumatologists. They were neurologists that were looking for other things. And if you go to A-108-1 and A-108-2, Dr. Brenner concedes. I want to make this very clear. I asked him, Doctor, this is right after we talked about that October 28 visit and how that one month before we put the symptoms four days after the vaccination. I got him to admit that. So I said, now, Doctor, would you agree that if he did have these reactions, and if you accept his testimony today in court that you heard correct, he said, yes, I did, that he did have reactions involving both arms, both shoulders, the neck, and the scapular region after both the second vaccination and the third. And more severely after the third vaccination, wouldn't you agree that there is evidence of challenge, re-challenge? Answer, I would agree that would be were it true. And I'm not saying that it is. That would be evidence of recurring reaction, yes. So he's agreeing. If you accept the testimony of the petitioner, which is not contradicted by the medical records, but in fact is confirmed by the medical records, and if you accept Dr. Blani's testimony, the evidence of challenge, re-challenge, Judge O'Malley, is not the theory of causation. It is further evidence. It's like further corroborating evidence. You don't need that. In the Lee case, there was no challenge, re-challenge. It was a simple vaccine caused a headache, triggered the fibromyalgia. What we have here is even stronger than the Lee case. And what Dr. Blani was trying to point out was there are all these ways the vaccine can trigger fibromyalgia. But in this case, it's even more obvious because he reacted after at least two of the vaccines, if not the first one, and maybe even three of them if you accept the first one. That's the case. I think this petition deserves compensation. Thank you. Thank you, Mr. Shoemaker and Ms. Perlman. The case is taken under submission.